# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| SONJIA MACK, | Case No.: 2:18-cv-00799-APG-VCF |
| Plaintiff | **Order (1) Denying the Plaintiff's Motion to Strike and (2) Granting in Part the Defendants' Motion for Summary Judgment** |
| v. | |
| BRIAN E. WILLIAMS, et al., | [ECF Nos. 19, 24] |
| Defendants | |

Plaintiff Sonjia Mack brought this civil rights lawsuit against defendants Brian Williams, James Dzurenda, Arthur Emling, and Mayra Laurian. Mack alleges the defendants deprived her of her constitutional rights when they detained and strip searched her without a warrant or her consent and indefinitely suspended her visiting privileges at High Desert State Prison (HDSP). Mack asserts the following claims under 42 U.S.C. § 1983.

The first three counts are against defendants Emling and Laurian. Count one alleges a procedural due process violation under the Fourteenth Amendment and Article 1 § 8 of the Nevada Constitution. Count two alleges cruel and unusual punishment in violation of the Fourteenth Amendment and Article 1 § 8 of the Nevada Constitution. Count three alleges an unreasonable search and seizure in violation of the Fourth Amendment and Article 1 § 18 of the Nevada Constitution.

The final two counts are against defendants Dzurenda and Williams. Count four alleges a procedural due process violation under the Fourteenth Amendment and Article 1 § 8 of the Nevada Constitution. Count five alleges an equal protection violation of the Fourteenth Amendment. The defendants move for summary judgment on all claims.

Mack moves to strike Exhibit A to the defendants' reply, which is a recording of a telephone conversation between Mack and inmate Karl Joshua. ECF No. 24. She argues the defendants impermissibly presented new evidence in a reply brief. *Id.*

I deny Mack's motion to strike. I grant the defendants' motion with respect to the federal claim in count one, as well as the federal and state claims in counts two, four, and five. I deny the defendants' motion with respect to the state claim in count one and the federal and state claims in count three.

**I. BACKGROUND**

On February 19, 2017, Mack arrived at HDSP with Tina Cates to visit their respective boyfriends, Karl Joshua and Daniel Gonzales. ECF Nos. 1 at 3; 11 at 3. Mack signed a form consenting to a search of her person, vehicle, or other property that she brought onto prison grounds. ECF No. 19-1 at 2. While Mack and Cates were in the waiting room, Emling and Laurian—investigators with the Nevada Inspector General's Office—asked Cates to go with them. ECF No. 19-3 at 5, 10. Emling had a warrant to search Cates and her car for illegal controlled substances. ECF No. 19-5 at 2. Cates was searched and no contraband was found. ECF No. 21-8 at 7.

Shortly after Emling and Laurian left with Cates, two HDSP officers—Officer Ronczka and Officer Krohm—approached Mack and escorted her to an administrative building. ECF No. 19-3 at 5-6. Although the order of the following events is unclear, the evidence shows that Laurian conducted a strip search of Mack. ECF No. 19-4 at 6-7. Additionally, Mack spoke with Emling about (1) whether she had anything illegal on her, (2) a prior occasion where she paid $300 to an unknown male on Joshua's behalf, and (3) whether she had knowledge of ongoing crimes. ECF Nos. 19-3 at 6; 21-8 at 6. Emling stated in his response to requests for admissions

2

that the $300 money exchange was a fact used in procuring the search warrant against Cates. ECF No. 21-8 at 6. He also stated that he had reasonable suspicion that Mack was connected to Cates through the exchange of money. *Id.* at 13-14. Mack avers that the money exchange occurred about six months prior to the day she was searched and had nothing to do with drugs. ECF No. 21-1 at 4.

Nevada Department of Corrections (NDOC) Administrative Regulation (AR) 422 requires officials to inform a visitor of the type of search to be performed and the ability to refuse the search. ECF No. 21-4 at 7. It also requires that a visitor give written consent to be strip searched unless a search warrant has been obtained and a peace officer is present. *Id.* To conduct a strip search, officers must have reasonable suspicion that a visitor possesses contraband. *Id.*

The parties disagree as to whether Mack consented to the strip search. Mack avers she never consented to a strip search and was never informed that she could refuse or that she was free to leave at any time. ECF No. 21-1 at 3-4. Emling asserts Mack was informed that she was free to leave and did not have to answer any questions. ECF No. 19-3 at 5-6. Laurian asserts Mack consented to the search because she had already signed the consent to search form and then she verbally consented to the strip search. ECF No. 19-4 at 6. In a recorded telephone conversation Mack had with Joshua after the fact, Joshua asked her if she complied with Emling and Laurian's requests and she said yes and that she "even volunteered to let them search me." ECF No. 22-1 at 9:40-9:50.[1] Mack also told Joshua "I just got to a point . . . I'm [going] to go.

---

[1] Mack seeks to strike the recording of the telephone conversation. *See* ECF No. 24. When new evidence is presented in a reply brief, district courts should not consider the new evidence without giving the non-moving party an opportunity to respond. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996). But even considering this evidence, genuine issues of fact remain as to whether Mack consented to a strip search and whether she felt free to leave. Thus, I deny Mack's motion as moot.

3

You done? I'm going. And I left." *Id.* at 20:50-20:58. No contraband was found on Mack as a result of the strip search. ECF No. 19-4 at 7.

After Mack was strip searched and questioned, she was denied visiting privileges for the day. ECF No. 19-3 at 9. On February 22, 2017, Mack received a letter from HDSP stating her visiting privileges were indefinitely suspended. ECF No. 21-6 at 2. The letter did not provide a reason. *Id.* It stated that Mack was "not allowed to return to this Institution without written request and permission through the Warden and/or Director." *Id.* NDOC policy requires that written denials of visits "shall clearly explain the reason for the action, the length of time the action will apply, the circumstances under which the action will be reconsidered, and instructions for appealing the action taken." ECF No. 21-3 at 16.

In his response to interrogatories, Williams, who is the Warden at HDSP, stated that Mack's visitation rights were suspended the day she was strip searched because "there [was] reason to believe she was involved in introducing contraband into the facility." ECF No. 19-6 at 6-7. He also stated that Mack was indefinitely suspended under AR 719, which states that "[t]he Warden has the authority to restrict or suspend an inmate's regular visiting privileges temporarily when there is reasonable suspicion that the inmate has acted in a way that would indicate a threat to the good order o[r] security of the institution." *Id.* at 6; *see also* ECF No. 21-3 at 3. When asked to admit that Mack was never given instructions on how to appeal the suspension, Dzurenda, the director of NDOC, stated that NDOC's administrative regulations are available on its website and made available to all inmates. ECF No. 21-7 at 6-7.

**II. ANALYSIS**

Summary judgment is appropriate if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

4

56(a), (c).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000); *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th Cir. 2018) ("To defeat summary judgment, the nonmoving party must produce evidence of a genuine dispute of material fact that could satisfy its burden at trial.").  I view the evidence and reasonable inferences in the light most favorable to the non-moving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In ruling on a qualified immunity defense, I consider whether the evidence, viewed in the light most favorable to the plaintiff, shows the defendants' conduct violated a constitutional right. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).  If so, I then determine whether the right was clearly established. *Id.*  I may perform this two-step inquiry in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

"A government official's conduct violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable

official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quotation omitted). The plaintiff need not identify a case "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* I make this second inquiry "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "If a genuine issue of material fact exists that prevents a determination of qualified immunity at summary judgment, the case must proceed to trial." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003).

### A. Count One

Mack alleges Emling and Laurian deprived her of procedural due process when they detained her without probable cause and conducted a warrantless strip search without her consent.[2] The defendants argue that Mack consented to the search and knew she was free to leave. They also argue, as with all their claims, that they are entitled to qualified immunity. Mack responds that she did not consent to the search and was not informed that she could refuse the search or that she was free to leave. She further argues that NDOC's prison regulations relating to strip searches create a protected liberty interest.

As described below, genuine issues of fact remain as to whether Mack consented to the strip search and whether she knew she was free to leave. But even assuming a violation occurred, Mack has failed to point to any clearly established law that would have put the defendants on notice that their conduct violated her right to procedural due process under the Fourteenth Amendment. For example, Mack does not cite to a case holding that Nevada's prison

---

[2] I apply the same analysis for both the U.S. Constitution and the Nevada Constitution due process claims. *See State v. Eighth Jud. Dist. Ct. (Logan D.)*, 306 P.3d 369, 377 (Nev. 2013) ("This court has consistently relied upon the Supreme Court's holdings interpreting the federal Due Process Clause to define the fundamental liberties protected under Nevada's due process clause."). This also applies to Mack's second and fourth causes of action.

6

regulations relating to strip searches created a protected liberty interest. Therefore, the defendants are entitled to qualified immunity on Mack's federal procedural due process claim.

However, "the doctrine of qualified immunity does not shield defendants from state law claims." *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1171 (9th Cir. 2013). The only reasons the defendants offer for summary judgment on this claim are qualified immunity and that Mack consented to the search and knew she could leave. But qualified immunity does not apply to the state law claim and genuine issues of fact exist. Therefore, I deny the defendants' motion as to Mack's state procedural due process claim.

### B. Count Two

Mack alleges that Emling and Laurian inflicted cruel and unusual punishment on her in violation of the Fourteenth Amendment and Article 1 § 8 of the Nevada Constitution when they detained and strip searched her without probable cause, a warrant, or her consent. The defendants argue that the prohibition against cruel and unusual punishment arises under the Eighth Amendment, but that amendment does not apply to Mack because she is neither a prisoner nor a pre-trial detainee. ECF No. 19 at 4-5. They also argue that they are entitled to qualified immunity. Mack's only response is that her claim does not arise under the Eighth Amendment. ECF No. 20 at 5.

The Eighth Amendment does not apply here because Mack is not a prisoner.[3] *See City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally

---

[3] Nevada's constitutional prohibition against cruel and unusual punishment under Article 1 § 6 similarly does not apply. *See State v. Eighth Jud. Dist. Ct. (Logan D.)*, 306 P.3d 369, 388 n.13 (Nev. 2013) (noting that when a person is not within the criminal punishment scheme, the application of cruel and unusual punishment does not apply).

7

associated with criminal prosecutions.") (citation omitted).  But Mack's claim is based upon the Fourteenth Amendment. ECF No. 1 at 7.  Neither party addresses whether that amendment can support a claim of cruel and unusual punishment.  However, even if Mack is correct that the Fourteenth Amendment could be the source of a prison visitor's right to freedom from cruel and unusual punishment, she points to no clearly established law that would have put the defendants on notice that their conduct would violate that right.  The defendants are thus entitled to qualified immunity on Mack's federal constitutional claim.

As to her state law claim, Mack again provides no authority for the proposition that the Nevada Constitution's due process clause (Article 1 § 8) protects prison visitors from cruel and unusual punishment.  Nevada interprets due process under its constitution the same as the Supreme Court of the United States interprets due process under federal law. *See supra* n.2.  The Supreme Court has found that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth . . . Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997).

For example, in *Graham v. Connor* the petitioner alleged excessive force during an investigatory stop in violation of the Fourteenth Amendment. 490 U.S. 386, 390 (1989).  The Court held that an excessive force claim in this context "is most properly characterized as one invoking the protections. . . against unreasonable. . . seizures" and should be analyzed under the Fourth Amendment—rather than the Fourteenth Amendment—because it "provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct." *Id.* at 394-95 (quotation omitted).  Consequently, a substantive due process analysis is not appropriate here if Mack's claim is covered by a specific Nevada constitutional provision,

such as its equivalent to the Fourth Amendment. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998).

Mack alleges in this count two that her detention and strip search amounted to cruel and unusual punishment under Nevada's due process clause. Mack also asserts in count three that the same alleged acts constituted an unreasonable search and seizure under Article 1 § 18 of the Nevada Constitution. Given the allegations, it is more appropriate to analyze Mack's claim under Article 1 § 18 than it is to analyze her claim under a novel theory that the state's due process clause protects her from cruel and unusual punishment. Further, Mack provides no authority for the proposition that Nevada would apply its due process standards rather than the state's unreasonable search and seizure standards. While there is no Nevada case directly on point, I predict that Nevada would follow the Supreme Court of the United States to hold that when a claim is covered by a specific state constitutional provision, as Mack's claim is covered by the unreasonable search and seizure clause here, courts should analyze the claim under that specific provision and not under substantive due process principles.[4] Accordingly, I grant the defendants' motion as to Mack's second cause of action.

**C.  Count Three**

Mack alleges that Emling and Laurian deprived her of her right to be free from unreasonable searches and seizures when the defendants detained and strip searched her.[5] The

---

[4] When a federal court interprets state law, it is bound by the decisions of the state's highest court. *Assurance Co. of Am. v. Wall & Assocs. LLC of Olympia*, 379 F.3d 557, 560 (9th Cir. 2004). Where the state's highest court has not decided the issue, a federal court must predict how that court would decide. *Orkin v. Taylor,* 487 F.3d 734, 741 (9th Cir. 2007). I may use "decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Assurance Co. of Am.*, 379 F.3d at 560 (quotation omitted).

[5] I apply the same analysis for the unreasonable search and seizure claims under the Fourth Amendment and the Nevada Constitution. *See Cortes v. State*, 260 P.3d 184, 191 (Nev. 2011)

defendants argue that Mack consented to the search and knew that she was free to leave. Mack avers that she did not consent, and she did not know she could refuse or leave.

Viewing the evidence in the light most favorable to Mack, a genuine dispute exists as to whether Mack consented to the strip search. Although she signed the consent form, the form does not specifically state a person is consenting to be strip searched. And a reasonable jury could find that she signed the form prior to being informed what kind of search would be conducted. Thus, a reasonable jury could find that Mack consented to only a routine pat down search and not the strip search. Additionally, Emling and Laurian state that Mack verbally consented to the strip search but Mack denies it. It is the jury's role to determine whether Mack verbally consented.

Emling and Laurian also assert that Mack was told that she was free to leave at any time. The defendants point to a telephone conversation between Mack and Joshua to show that Mack knew she was free to leave when she said, "I just got to a point . . . I'm [going] to go. You done? I'm going. And I left." But Mack denies under oath that she felt free to leave. A reasonable jury could find that Mack did not feel free to leave.

        1.    Strip Search

The defendants argue that, regardless of consent, the strip search was valid because Emling and Laurian needed only reasonable suspicion. They contend they had reasonable suspicion that Mack had introduced contraband into the prison because of her association with Cates and the $300 payment she made to an unknown male months prior. Mack argues that the defendants did not have reasonable suspicion because their suspicion was directed at Cates, not

---

(declining to impose a stricter standard to the search and seizure clause of the Nevada Constitution than the U.S. Constitution requires in a traffic stop setting).

her, and because the defendants have failed to explain how a $300 payment was related to the introduction of contraband.

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Bonivert v. City of Clarkston*, 883 F.3d 865, 873 (9th Cir. 2018) (quoting U.S. Const. amend. IV). "The test of reasonableness. . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

Officials need reasonable suspicion that a prison visitor possesses contraband in order to strip search her. *See Martinez v. Cty. of San Diego*, 962 F.2d 14, 1992 WL 98452 (9th Cir. 1992) ("[A] review of all available decisional law establishes that by September 1988, a reasonable officer would have surmised she needed reasonable suspicion to carry out [a strip] search.") (quotation and internal citation omitted). Reasonable suspicion requires that an officer, looking at the totality of the circumstances, have a "particularized and objective basis for suspecting" that an individual is engaged in criminal activity. *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). While this process "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them," officers need to demonstrate more than a "mere hunch." *United States v. Arvizu*, 534 U.S. 266, 273-74 (2002) (citation omitted). It is a "commonsense, nontechnical conception[ ] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).

11

Viewing the evidence in the light most favorable to Mack, a reasonable jury could find that the defendants did not have reasonable suspicion to strip search her. Emling stated in his response to interrogatories that "Ms. Mack was not suspected of bringing drugs or contraband into HDSP." *See* ECF No. 21-5 at 5. The defendants present no evidence demonstrating that the $300 money exchange was related to drugs or to Cates, that Mack was conspiring with Cates, or that Mack knew of any plan to bring contraband into the facility. A genuine dispute exists as to whether Emling and Laurian had reasonable suspicion to strip search Mack.

The defendants alternatively contend that they are entitled to qualified immunity because they were not on clear notice that their actions violated Mack's constitutional rights. Mack argues that it was clearly established law that strip searches of prison visitors must be based on reasonable suspicion.

While not addressed by the Supreme Court or the Ninth Circuit in a published decision, many other circuit courts, dating back to the 1980s, have held officers need reasonable suspicion that a prison visitor possesses contraband in order to strip search them.[6] And the Ninth Circuit,

---

[6] *See Spears v. Sowders*, 71 F.3d 626, 630 (6th Cir. 1995) (requiring prison officials have at least reasonable suspicion that a visitor has contraband before conducting a body cavity search); *Wood v. Clemons*, 89 F.3d 922, 927 (1st Cir. 1996) ("a prison-visitor strip search must be predicated upon reasonable suspicion") (quotation omitted); *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997) (finding it was clearly established that correctional officers need reasonable suspicion to strip search prison visitors); *Thorne v. Jones*, 765 F.2d 1270, 1277 (5th Cir. 1985); *Burgess v. Lowery*, 201 F3d 942, 945 (7th Cir. 2000) ("In a long and unbroken series of decisions by our sister circuits stretching back to the early 1980s, it had become well established. . . that strip searches of prison visitors were unconstitutional in the absence of reasonable suspicion that a visitor was carrying contraband."); *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir. 1982) ("[W]e conclude that the Constitution mandates that a reasonable suspicion standard govern strip searches of visitors to penal institutions.").

in unpublished opinions, has similarly required reasonable suspicion to strip search prison visitors.[7]

Because a reasonable officer would have known he needed reasonable suspicion to strip search a prison visitor, Emling and Laurian are not entitled to qualified immunity. I thus deny the defendants' motion as to Mack's unreasonable search claim.

### 2. Seizure

The defendants argue that Mack was never seized because she was informed that she could refuse the strip search and that she could leave at any time. Mack avers that she was never informed that she could refuse or leave.

A person is seized "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980). "Examples of circumstances that might indicate a seizure, even where a person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." *U.S. v. Drayton*, 536 U.S. 194, 201 (2002).

---

[7] *See Martinez v. Cty. of San Diego*, 962 F.2d 14, 1992 WL 98452 (9th Cir. 1992) ("[A] review of all available decisional law establishes that by September 1988, a reasonable officer would have surmised she needed reasonable suspicion to carry out [a strip] search.") (quotation and internal citation omitted); *Evans v. Cty. of Sacramento*, 165 F.3d 915, 1998 WL 823395 (9th Cir. 1998) (finding no Fourth Amendment violation where a prison visitor was subjected to "non-invasive body searches" based on reasonable suspicion that she was in possession of contraband).

13

Viewing the evidence in the light most favorable to Mack, a genuine dispute exists as to whether Mack was seized. Mack saw Cates taken away by Emling and Laurian. Mack was then escorted into a different building and separated from the routine visiting process. All of this was done inside the prison, with officers and investigators present. Mack disputes under oath that she was told she was free to leave. Because a jury could find that a reasonable person in Mack's position would have believed that she was not free to leave, I deny the defendants' motion as to Mack's unreasonable seizure claim.

**D.  Count Four**

Mack alleges that Dzurenda and Williams deprived her of procedural due process when they upheld or maintained the indefinite suspension of her visiting privileges. The defendants argue that Mack has no protected liberty interest in prison visitation and that Mack cannot point to a regulation or case law to support the proposition that a liberty interest has been created. Mack responds that AR 719 and the accompanying inmate visitation manual created a liberty interest by prohibiting the arbitrary suspension of visitation privileges and mandating certain criteria be met before a suspension.

To prevail on a procedural due process claim, Mack must prove "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998). "The fundamental requirements of procedural Due Process are notice and an opportunity to be heard. . . ." *Conner v. City of Santa Ana*, 897 F.2d 1487, 1492 (9th Cir. 1990) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

A liberty interest may arise from either the due process clause or state law. *Mendoza v. Blodgett*, 960 F.2d 1425, 1428 (9th Cir. 1992) (citing *Hewitt v. Helms*, 459 U.S. 460, 466

(1983)). Whether state law gives rise to a protected liberty interest for purposes of the federal constitution is a question of federal law. *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756-57 (2005). A state creates a protected liberty interest when it places substantive limitations on official discretion. *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989). State law may create a protected liberty interest "by establishing substantive predicates to govern official decision-making, . . . and . . . by mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Id.* (quotation and internal citation omitted).

For a state prison regulation to create a protected liberty interest, the regulation must contain explicit, mandatory language directing a certain course that the decision-maker must follow. *Thompson*, 490 U.S. at 463. Even if a state regulation creates an entitlement, the court still must determine whether that constitutes a liberty interest for purposes of the due process clause in the U.S. Constitution. *Town of Castle Rock, Colo.*, 545 U.S. at 766.

In *Kentucky Department of Corrections*, the Supreme Court was asked whether the state's regulations governing general prison visitation created a liberty interest that required due process protections. 490 U.S. at 456-59. The Court found the regulations created certain "substantive predicates." *Id.* at 463-64. For example, the regulations explain when a visitor may be excluded, provide a list of reasons for denying visitation, and contain standards for staff to apply in determining when to refer a situation to the officer on duty. *Id.* Ultimately, the Court held that the regulations did not establish a liberty interest protected by the due process clause because they lacked the requisite mandatory language that would deprive decision-makers of discretion. *Id.* 464-65 (noting that the procedures memorandum began with a caveat that the staff reserves the right to allow or disallow visits and the language throughout provided the staff with directions on what they may do, not what they had to do).

15

The Ninth Circuit has concluded that there is no constitutional right to prison visitation. *See Dunn v. Castro*, 621 F.3d 1196, 1201-03 (9th Cir. 2010) (detailing the Circuit's prior decisions holding that prisoners do not have a constitutional right to visitation); *see also Egberto v. McDaniel*, No. 3:08-CV-00312-HDM-VPC, 2011 WL 123358, at *8 (D. Nev. Mar. 28, 2011), *aff'd*, 565 F. App'x 663 (9th Cir. 2014) ("A Nevada inmate and prison visitor are never guaranteed visitation, which is a discretionary privilege and not a right.").

Mack does not have a protected liberty interest in visitation. AR 719 contains substantive predicates to guide the decision-maker. For example, Mack notes that the regulation provides that: 1) "denial and any subsequent restriction, suspension, or termination of previously approved visits, shall be documented. . . and a copy sent to the applicant/visitor as soon as practicable;" and 2) "such documentation shall include the name of the official taking or ordering the action, shall clearly explain the reason for the action, the length of time the action will apply, the circumstances under which the action will be reconsidered, and instructions for appealing the action taken." ECF No. 20 at 13. But that language is irrelevant to determining whether the regulation "requires the decisionmaker to apply certain substantive predicates in determining whether an inmate [or visitor] may be deprived of the particular interest in question." *Thompson*, 490 U.S. at 464 n.4.

The relevant language in AR 719 states that the Warden "may suspend visiting privileges of a visitor" and provides a nonexhaustive list of the possible reasons for suspension. ECF No. 21-3 at 15. Ultimately, the Warden retains discretion to determine who may visit and when to reinstate visiting privileges if they have been suspended or terminated. *See id.* at 14-16. The prison regulations, therefore, lack the required mandatory language necessary to create a protected liberty interest. I grant the defendants' motion as to Mack's fourth cause of action.

### E. Count Five

Mack alleges that her Fourteenth Amendment right to equal protection was violated when Williams and Dzurenda indefinitely terminated or upheld the termination of Mack's visiting privileges while allowing other similarly situated visitors to maintain their visiting privileges. The defendants argue they had a legitimate reason to suspend Mack's visiting privileges because of the information gathered by the Inspector General's office and because of her association with Cates. Mack argues it was unreasonable to suspend her visiting privileges after she was strip searched and no contraband was found.

The Equal Protection Clause of the Fourteenth Amendment is essentially a direction that all similarly situated persons be treated equally under the law. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Given that Mack has not alleged that she is a member of a protected class or that a fundamental right was violated, she must show that the defendants purposefully treated her differently than similarly situated individuals without any rational basis for the disparate treatment. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ("Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."). "When a state policy does not adversely affect a suspect class or impinge upon a fundamental right, all that is constitutionally required of the state's program is that it be rationally related to a legitimate state objective." *Coakley v. Murphy*, 884 F.2d 1218, 1221-22 (9th Cir. 1989).

"Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 547. "[I]n the

absence of substantial evidence in the record to indicate that officials have exaggerated their response [to detect and deter the possession of contraband in their facilities,] courts should ordinarily defer to their expert judgment in such matters." *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 328 (2012) (quotation omitted).

Mack provides insufficient evidence from which a reasonable jury could find the defendants purposefully treated her differently from similarly situated visitors. Under a routine search, when no contraband is found visitors may proceed with visitation. *See* ECF No. 19-3 at 8. However, the search here was not routine. Mack has not presented evidence of another visitor who was 1) associated with a person who had a search warrant against her; 2) suspected of introducing contraband into the facility through such association as well as a money exchange; and 3) currently involved in a confidential investigation by NDOC. Nor has she shown that such an individual retained visiting privileges while Mack's privileges were suspended.

The defendants have demonstrated that the suspension of Mack's visiting privileges was a rational response to a legitimate interest in preventing the introduction of contraband into the prison. They cite to *Robinson v. Palmer*, 841 F.2d 1151 (D.C. Cir. 1988) to justify the indefinite suspension of visiting privileges. In *Robinson*, the court found the permanent denial of visitation to be a rational response after marijuana was found on the plaintiff during a visit. 841 F.2d at 1153. Here, the defendants did not find any contraband on Mack. But given the strong deference afforded to prison administrators in securing the safety of the institution, and under the facts described above, no reasonable jury could find that Mack's suspension was not a rational response to the perceived threat of the introduction of contraband into the prison. Because there is no genuine issue in dispute, I grant the defendants' motion as to Mack's fifth cause of action.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment **(ECF No. 19)** is **GRANTED IN PART**. The motion is granted as to the federal claim in count one and as to the state and federal claims in counts two, four and five. The motion is denied as to the state claim in count one and as to the state and federal claims in count three.

IT IS FURTHER ORDERED that plaintiff Sonjia Mack's motion to strike **(ECF No. 24)** is **DENIED**.

DATED this 25th day of September, 2019.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE